NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0102-17T2

MARY RICHTER,

       Plaintiff-Appellant/
Cross-Respondent,

v.

OAKLAND BOARD OF
EDUCATION,

       Defendant-Respondent/
Cross-Appellant,

and

GREGG DESIDERIO, Individually
and as Principal of the Valley
Middle School,

       Defendant-Respondent.

_____

APPROVED FOR PUBLICATION

June 11, 2019

APPELLATE DIVISION

Argued February 4, 2019 – Decided June 11, 2019

Before Judges Sabatino, Sumners and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-0742-15.

Gerald J. Resnick argued the cause for appellant/cross-respondent (Resnick Law Group, PC, attorneys; Gerald J. Resnick, on the briefs).

Betsy Gale Ramos argued the cause for respondent/cross-appellant (Capehart & Scatchard, PA, attorneys; Betsy Gale Ramos and Voris M. Tejada, on the briefs).

Aileen F. Droughton argued the cause for respondents Oakland Board of Education and Gregg Desiderio (Traub Lieberman Straus & Shrewsberry LLP, attorneys; Aileen F. Droughton, of counsel and on the brief; Benjamin L. Rouder, on the brief).

The opinion of the court was delivered by

SUMNERS, J.A.D.

This matter presents several questions for us to decide. On appeal, the first issue is whether an employee alleging disability discrimination for failure to accommodate under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, is required to establish an adverse employment action to avoid summary judgment dismissal. We also must determine whether the motion judge erred in denying the employee's cross-motion for summary judgment. In the event we determine there is no requirement to establish adverse employment action, the issue on cross-appeal is whether a bodily injury claim arising from the failure to accommodate allegation should be dismissed because it is barred by the exclusive remedy provision of the Workers' Compensation Act (the Compensation Act), N.J.S.A. 34:15-1 to -146. In addition, we must decide whether medical bills and lost wages can be

introduced at trial, and if any worker's compensation lien should be applied to any award in plaintiff's favor.

Plaintiff Mary Richter, a middle school teacher who suffers from diabetes, alleges she fainted while teaching due to low blood sugar levels when she was unable to eat lunch at an earlier class period and suffered significant and permanent injuries. She contends the accident would not have occurred had defendants Oakland Board of Education (the Board) and Gregg Desiderio granted her accommodation request to eat lunch earlier. The motion judge granted defendants' motion for summary judgment dismissing Richter's complaint, denied Richter's cross-motion for summary judgment, and denied reconsideration of the dismissal. The judge held that as a matter of law, Richter failed to prove a prima facie case of failure to accommodate her disability because she did not establish an adverse employment action. Thus, her bodily injury claim, which is the subject of the Board's cross-appeal, was denied as moot.

Under the circumstances of this case, we reverse the motion judge's grant of summary judgment dismissing Richter's complaint. Based on our consideration of Supreme Court decisions in Victor v. State, 203 N.J. 383 (2008) and Royster v. N.J. State Police, 227 N.J. 482 (2017), we conclude that Richter need not demonstrate an adverse employment action to establish a

prima facie case of a failure to accommodate claim under the LAD. Because there were genuine issues of material facts concerning whether Richter was provided an accommodation and whether the accommodation was adequate, which must be determined at a trial, we affirm the denial of Richter's cross-motion for summary judgment. As to the Board's cross-appeal, we conclude the Compensation Act does not bar Richter's bodily injury claim, but should she prevail at trial, the Board should receive a credit based on the amount it paid in her workers' compensation claim in accordance with N.J.S.A. 34:15-40 (section 40).

I

Richter, a Type I Diabetic, is employed by the Board as a science teacher at Valley Middle School (VMS). VMS's academic calendar is divided into four marking periods. Each school day consists of eight class periods. Student lunch periods are during the fifth and sixth periods, which take place between 11:31 a.m. to 1:02 p.m. Teachers are assigned to supervise students during lunch, designated as cafeteria duty. Thus, some teachers are scheduled to have their lunch from 1:05 p.m. to 1:49 p.m., during seventh period. They are also assigned other non-teaching responsibilities, such as hall duty and health office duty.

At the beginning of the 2012/2013 school year, Richter received her schedule, in which she was assigned to cafeteria duty on Wednesdays and Thursdays during fifth period, followed by teaching a class during sixth period and having her lunch during seventh period. Richter believed that waiting until seventh period, which began at 1:05 p.m., to eat a meal would have a negative effect on her blood sugar levels due to the medications she takes for her diabetes. Therefore, she asked Desiderio, the VMS principal, to have her schedule adjusted so that she could have lunch during the earlier fifth period. Desiderio responded that he would "look into it."

After Desiderio failed to contact her, Richter sent a follow-up email on September 10, 2012, reiterating her need for a schedule change because of her medical condition. It was not until Richter sent another email that Desiderio responded by stating he would look into her request, but cautioned he could not "undo what he did." Thus, during the first marking period, Richter maintained her fifth-period cafeteria duty for two days a week. With her lunch delayed until seventh period, she ingested glucose tablets during sixth period to maintain her blood sugar levels.

When plaintiff received her schedule for the second marking period, her lunch was scheduled for the fifth period every school day – which satisfied her request for an earlier lunch. This, however, changed for the third marking

A-0102-17T2

period, when she was scheduled for cafeteria duty and teaching science respectively during the fifth and sixth periods on Tuesdays with her lunch set for seventh period that day. Richter immediately approached Desiderio to remind him of her need to have lunch during fifth period, as she had throughout the second marking period. He verbally told her that he needed her for cafeteria duty because three teachers had to be assigned to the duty. He then suggested that if she was not feeling well, she should sit down to have a snack, and return to cafeteria duty when she was feeling better. The VMS vice principal told her she should skip cafeteria duty. Her union president instructed her that she would not be disciplined for skipping cafeteria duty.

Under the impression that the school's official schedule would have to be revised in writing, Richter believed she was still obligated to remain on cafeteria duty during fifth period on Tuesdays. Desiderio never directed anyone in the school's office to change Richter's schedule, or otherwise noted anywhere that her scheduled lunch period on Tuesdays changed from Seventh period to fifth period to accommodate her medical condition. Consequently, Richter's blood sugar levels on Tuesdays often fell below the normal range as she approached the end of her sixth period class, requiring her to ingest three or more glucose tablets to try to keep her sugar elevated.

A-0102-17T2

Unfortunately, on Tuesday, March 5, 2013, towards the end of the sixth period, despite ingesting glucose tablets throughout the period, Richter suffered a hypoglycemic event in front of her students. She had a seizure and became unconscious causing her to strike her head and face on a lab table and the floor, and to bleed extensively. She was transported to the hospital for treatment. Even though she had minor hypoglycemic events at school in the past, she had never passed out at school.

After the accident, Desiderio sent a number of text messages to Richter telling her that he previously told her not to attend cafeteria duty on Tuesdays. When she again asked Desiderio to make some documented change in her schedule, he placed an X on her schedule where it indicated she had cafeteria duty during fifth period on Tuesdays.

From her fall, Richter suffered the following serious and permanent injuries: total loss of smell;[1] meaningful loss of taste; dental and facial trauma; tinnitus; insomnia; tingling in her fingers; extraction of her right front tooth; implantation of a dental bridge, and bone grafts; altered speech; pain in neck and radiation to posterior shoulder; paranesthesia and dysesthesias; post-concussion syndrome; vertigo; dizziness; severe emotional distress; and

---

[1] Because of her inability to smell, Richter had to request gas monitors in her classroom.

A-0102-17T2

decreased life expectancy. She lost sick days and incurred significant dental costs not covered by her insurance.

As a result of her work-related injuries, Richter filed a workers' compensation claim. The Board paid $18,940.94 for her medical bills, $9,792.40 for temporary disability benefits and $77,200 for the permanent injuries she suffered.

Richter sued the Board and Desiderio, individually and as principal of the school, alleging disability discrimination in violation of the LAD due to their alleged failure to accommodate her medical condition. The Board's initial motion for partial summary judgment to dismiss Richter's bodily injury claim as being barred by the Compensation Act was denied on July 10, 2015. In an oral decision, the motion judge, citing Laidlow v. Hariton Mach. Co., Inc., 170 N.J. 602 (2002), held that under the Compensation Act's intentional wrong exception, Richter's LAD bodily injury claim was not barred.

Thereafter, both defendants moved for summary judgment to dismiss Richter's complaint with prejudice, claiming Richter did not establish a prima facie LAD claim of disability discrimination for failure to accommodate because she suffered no adverse employment action. Richter cross-moved for summary judgment claiming she suffered an adverse employment action to establish a prima facie LAD claim. The Board then re-filed their summary

judgment motion to dismiss the bodily injury claim, or in the alternative, be entitled to a 100% credit for all the money paid to Richter through her workers' compensation claim and barring her medical bills and lost wages from being presented at trial.

On May 5, 2017, a different motion judge granted defendants' motion for summary judgment dismissing Richter's LAD complaint and ruled that the motion to dismiss the bodily injury claim was denied as moot. Concurrently, plaintiff's cross-motion was denied.

In her written decision, the judge noted that "the New Jersey Supreme Court may later decide to strike 'adverse employment action' as a distinct element in a failure to accommodate claim, [but] it has not yet done so," and held that adverse employment action remains a required element to make a prima facie case of failure to accommodate under the LAD. Because Richter was not fired or reassigned to another position, the judge determined she could not establish a prima facie case of adverse employment action. In addition, the judge asserted that even though plaintiff's injuries were unfortunate, they were not due to defendants' action because it was Richter's personal decision to continue attending cafeteria duty on Tuesdays rather than eating.

Richter moved for reconsideration. In the event the motion was granted, the Board cross-moved for reconsideration of the denial of dismissal of

Richter's bodily injury claim with prejudice, or in the alternative, a 100 % credit for the workers' compensation payments. Ruling on the papers, the judge denied Richter's motion and issued a written decision finding there was no merit to her LAD claim because by failing to establish she suffered an adverse employment action, a prima facie failure to accommodate claim was not made. The judge reiterated her prior decision by declaring the Board's cross-motion as moot. This appeal and cross-appeal followed.

## II

We begin with Richter's contention that the motion judge erred in granting summary judgment dismissal of her LAD claim as a matter of law because she presented no evidence that she suffered an adverse employment action due to Desiderio's failure to reasonably accommodate her diabetes disability by giving her an earlier lunch period to avoid a decrease of her blood sugar levels. In support, she relies upon Victor; Royster; Model Jury Charges (Civil), 2.21, "The New Jersey Law Against Discrimination ("NJLAD") (N.J.S.A. 10:5-1[to -42])" (approved May 2003); Model Jury Charges (Civil), 2.26, "Failure to Accommodate Employee with Disability Under the [NJLAD]" (approved Feb. 2013); and N.J.A.C. 13:13-1.1 to -2.5(b).[2]

---

[2] Richter's reliance upon N.J.A.C. 13:13-1.1 to -2.5(b) regarding adverse employment actions are without sufficient merit to warrant discussion in a

(continued)

This court reviews de novo a ruling on a motion for summary judgment, applying "the same standard governing the trial court[.]" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014). We consider, as the motion judge did, "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Id. at 406 (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "If there is no genuine issue of material fact," then we must "decide whether the trial court correctly interpreted the law." DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (citation omitted). We accord no deference to the trial judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (citing Zabilowicz v. Kelsey, 200 N.J. 507, 512-13 (2009)).

A.

With these summary judgment guidelines in mind, we conclude Richter's LAD claim should not have been dismissed on summary judgment because based on the circumstances before us, there was no obligation that she

_____

(continued)
written opinion. R. 2:11-3(e)(1)(E). The regulations do not address whether a plaintiff is required to prove an adverse employment action to sustain a LAD failure to accommodate claim.

establish an adverse employment action to sustain her LAD claim of failure to accommodate her disability.

We start our analysis with Victor, where Justice Helen E. Hoens, writing the decision for the unanimous Court, gave a thorough and thoughtful examination of the LAD by our courts and the related Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 to 12213, by federal courts, in considering "whether an adverse employment consequence is an essential element of a plaintiff's claim that his employer discriminated against him by failing to accommodate his disability." 203 N.J. at 388. The plaintiff, a New Jersey State Trooper, requested administrative duty because he claimed a back injury made it difficult for him to wear a protective vest that was required to be worn during full-duty activity. Id. at 389, 391-92. He did not produce any medical documentation to support his request, so his station commander – after consulting the New Jersey State Police (NJSP) Director of Medical Services – denied the request and ordered him to perform full-duty activity during a four-hour period. Id. at 391-92, 412. The plaintiff's claim of failure to accommodate his disability was among several discrimination claims he later made against the NJSP, but was the only claim addressed in Victor. Id. at 389-90.

The Court acknowledged that an adverse employment action has generally been recognized as an element of a prima facie case of disability discrimination for failure to accommodate, but stressed "[i]dentifying the elements of the prima facie case that are unique to the particular discrimination claim is critical to its evaluation[,]" because "[d]isability discrimination claims are different from other kinds of discrimination claims, for several reasons." Id. at 410. Yet, the Court acknowledged, "the LAD does not directly answer the question" of whether a plaintiff must prove adverse employment action "because its reasonable accommodation protections are not explicit." Id. at 412.

Commenting on our state's published decisions determining "adverse employment consequence as one element of the prima facie case for disability discrimination," the Court stressed:

> Those opinions do so, however, in part because they recite the familiar elements consistent with any employment discrimination case, and in part because the factual setting of each case included an adverse job consequence. For example, this Court has touched on the question of reasonable accommodations, but only as to an employee who contended that the failure to accommodate resulted in termination, making separate consideration of adverse employment consequence irrelevant. See Raspa [v. Office of Sheriff of Cty. of Gloucester, 191 N.J. 323, 327, 340 (2007)] (recognizing that some employment positions have requirements similar to the bona fide occupational qualifications set forth in federal law that

> impact on reasonable accommodation analysis); Potente [v. Cty. of Hudson, 187 N.J. 103, 111 (2006)] (concluding that employee may not raise LAD claim if he or she has refused to engage in interactive dialogue respecting potential accommodations).
>
> [203 N.J. at 413.]

On the other hand, the Court recognized that Seiden v. Marina Assocs., 315 N.J. Super. 451, 459-61 (Law Div. 1998), "seems to equate [that] the failure to accommodate with an unlawful employment practice, is included as part of the court's explanation about why the McDonnell Douglas[3] burden-shifting framework is not useful [and unnecessary] in the context of a failure to accommodate claim." Id. at 413-14. The Court also found it significant in Tynan v. Vicinage 13 of Superior Court, 351 N.J. Super. 385, 400-01 (App. Div. 2002), where in "a disability discrimination claim based on an employer's failure to engage in the interactive accommodation process, in which [this] court did not include the requirement that the employee suffer an adverse employment consequence." Id. at 414.

Given the LAD's broad remedial purposes, the Court believed that it was time to

> chart a course to permit plaintiffs to proceed against employers who have failed to reasonably

---

[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

accommodate their disabilities or who have failed to engage in an interactive process even if they can point to no adverse employment consequence that resulted.[4]  Such cases would be unusual, if not rare, for it will ordinarily be true that a disabled employee who has been unsuccessful in securing an accommodation will indeed suffer an adverse employment consequence.

[Id. at 421.]

The Court, nevertheless, ruled that based upon the record presented, it was "constrained to refrain from resolving today the question of whether a failure to accommodate unaccompanied by an adverse employment consequence may be actionable."  Id. at 422.  First, the record failed to establish plaintiff was disabled when he sought an administrative duty assignment.  Id. at 423.  Second, there was insufficient proof that he sought a reasonable accommodation based upon his mere request, as the employer only has a duty to accommodate an employee's physical disability and not simply agree to a request without engaging in the interactive accommodation request to determine a reasonable accommodation.  Id. at 423-24.

The Court recognized that under the right set of facts, the LAD might cover a disability discrimination claim for failure to accommodate absent an adverse employment action.  As Justice Hoens wrote:

---

4  Model Jury Charges (Civil), 2.26, quoted this comment from Victor in footnote number three; noting it as "dictum."

Perhaps in those circumstances the employee could demonstrate that the failure to accommodate forced the employee to soldier on without a reasonable accommodation, making the circumstances so unbearable that it would constitute a hostile employment environment. But there also might be circumstances in which such an employee's proofs, while falling short of that standard, would cry out for a remedy. We cannot foresee all of the factual settings that might confront persons with disabilities and, although hard to envision, we therefore cannot entirely foreclose the possibility of circumstances that would give rise to a claim for failure to accommodate even without an identifiable adverse employment consequence.

[203 N.J. at 421-22.]

Almost ten years later in Royster, another State Trooper employment discrimination case, the Court decided in the interest of justice to reinstate the plaintiff's LAD failure to accommodate claim that was mistakenly dismissed. 227 N.J. at 501. In doing so, the Court articulated the standard to establish a prima facie claim – without including the requirement that an adverse employment action must be proven. Citing Victor, the Court ruled:

To establish a failure-to-accommodate claim under the LAD, a plaintiff must demonstrate that he or she (1) "qualifies as an individual with a disability, or [ ] is perceived as having a disability, as that has been defined by statute"; (2) "is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations"; and (3) that defendant "failed to reasonably accommodate [his or her] disabilities." Victor, []203 N.J. at 410, 421[]. Although these

elements do not mirror those of the ADA, the same proofs are implicated: (1) the plaintiff had a disability; (2) the plaintiff was able to perform the essential functions of the job; (3) the employer was aware of the basic need for an accommodation; and (4) the employer failed to provide a reasonable accommodation.

[227 N.J. at 500.]

Our interpretation of Victor and Royster leads us to conclude that Richter's LAD claim for failure to accommodate her diabetes disability should not have been dismissed on summary judgment based on a lack of adverse employment action. Viewing the facts in the light most favorable to Richter, her claim falls within the unusual situation contemplated in Victor where "the employee could demonstrate that the failure to accommodate forced the employee to soldier on without a reasonable accommodation[]" and there need not be proof of adverse employment action because the circumstances "cry out for a remedy." 203 N.J. at 421. She requested an accommodation for an earlier lunch period to avoid a hypoglycemic event from not eating, which was provided for one marking period but not the following marking period. Under the impression that Desiderio did not change her schedule to allow for the earlier lunch period and she could not eat her lunch while supervising students during her cafeteria duty, Richter "soldiered on" by taking glucose tablets to maintain her blood sugar levels in order to teach. Sadly, her worst fears came

17

to fruition when she fainted and seriously injured herself in front of her students. Hence, she should be allowed to present her claim for damages under the LAD at trial.

### B.

Having concluded that Richter need not establish an adverse employment action to establish a prima facie claim under the LAD for failure to accommodate, we briefly address her contention that Victor stands for the proposition that defendants' refusal to accommodate an employee's disability constitutes an adverse employment action. She asserts, "there is no bright-line rule for identifying an adverse employment action" and the "proofs necessary to demonstrate an adverse employment action must be examined on a case-by-case basis." See Mancini v. Twp. of Teaneck, 349 N.J. Super. 527, 564 (App. Div. 2002) aff'd in part and modified in part, 179 N.J. 425 (2004); Victor v. State, 401 N.J. Super. 596, 615 (App. Div. 2008). With respect to her claim, Richter argues the terms and conditions of her employment had been seriously altered, by continuously ingesting glucose tablets to maintain her blood sugar levels and the refusal to change her lunch period caused her to experience constant hypoglycemic symptoms, such as sweats, disorientation, and fatigue.

We agree there is no bright-line rule defining an adverse employment action in the context of a LAD claim. New Jersey has been guided by the

federal courts' interpretation of Title VII and civil rights legislation to decide what constitutes an adverse employment decision with regards to a LAD retaliation claim. Mancini, 349 N.J. Super. at 564 (citation omitted). The factors to be considered include an "employee's loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment by other employees." Ibid. As the federal district court stated in Marrero v. Camden County Board of Social Services, 164 F. Supp. 2d 455, 473 (D.N.J. 2001),

> [i]n order to constitute "adverse employment action" for the purpose of the LAD, "retaliatory conduct must affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate or classify the plaintiff in a way which would tend to deprive her of employment opportunities or otherwise affect her status as an employee."

In the context of whistle-blower claims under the New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, an "employer actions that fall short of [discharge, suspension or demotion], may nonetheless be the equivalent of an adverse action." Nardello v. Twp. of Voorhees, 377 N.J. Super. 428, 433-34 (App. Div. 2005) (alteration in original) (quoting Cokus v. Bristol Myers Squibb Co., 362 N.J. Super. 366, 378 (Law Div. 2002)). That being said, "not every employment action that

A-0102-17T2

makes an employee unhappy constitutes 'an actionable adverse action.'" Id. at 434 (quoting Cokus, 362 N.J. Super. at 378).

Although an "adverse employment action under the LAD is [not] the same as a retaliatory action under CEPA," we have acknowledged

> that an employer's adverse employment action must rise above something that makes an employee unhappy, resentful or otherwise cause an incidental workplace dissatisfaction. Clearly, actions that affect wages, benefits, or result in direct economic harm qualify. So too, noneconomic actions that cause a significant, non-temporary adverse change in employment status or the terms and conditions of employment would suffice. We recognize an exhaustive list of qualifying events cannot be compiled and these determinations must turn on the facts and circumstances presented.
>
> [Victor, 401 N.J. Super. at 616.]

Although we do not marginalize Richter's unfortunate injuries caused by her hypoglycemic event, we are constrained to conclude her situation does not rise to the level of an adverse employment action as our courts have contemplated to date under the LAD. Defendants' actions did not materially alter the terms and conditions of her employment. Nor did they deprive her of any employment privileges or opportunities, or otherwise change her employment status. Accordingly, we do not conclude that she suffered an adverse employment action based upon defendants' alleged conduct in not accommodating her accommodation.

We next address Richter's contention that the motion judge should have granted her cross-motion for summary judgment because there was no genuine issue of material fact as to the failure to accommodate her disability and defendants acted in bad faith in failing to engage in the interactive process to address her accommodation request. She argues that by determining she was reasonably accommodated, not only did the judge fail to accept as true all the evidence supporting her position, but the judge also failed to accord her the benefit of all legitimate inferences which can be deduced therefrom, and improperly weighed the evidence in defendants' favor. We are unpersuaded.

Richter asserts defendants failed to initiate an informal interactive process with the employee to determine what appropriate accommodation is necessary as required by N.J.A.C. 13:13-1.1 to -2.5(b). See Tynan, 351 N.J. Super. at 400; 29 C.F.R. § 1630.2(o)(3). In particular, she avers the judge completely disregarded that: (1) her accommodation request was reasonable; (2) defendants never claimed the accommodation she sought was unreasonable or caused an undue hardship for the Board; (3) Desiderio never sought to understand her accommodation request and why she needed her lunch to be during the fifth period; (4) Desiderio had little discussion with her about her disability and the requested accommodation; (5) Desiderio completely ignored

21

her accommodation request for the entire first marking period; and (6) Desiderio's "solution" to "have a snack and then go to [cafeteria] duty" did not adequately accommodate her medical needs and therefore was not an effective accommodation.

In order to demonstrate an employer failed to participate in the interactive process, a disabled employee must show:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.
>
> [Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319-20 (3d Cir. 1999).]

While there were no disputes concerning the first and second factors, there were factual disputes as to the third and fourth factors. Defendants point to statements by Desiderio, the vice principal and the union president that Richter was verbally told at the beginning of the third marking period – prior to her fall on March 5, 2013 – that she did not have to perform her fifth period cafeteria duty if she felt she needed to eat her lunch. Richter, however, thought in order for an accommodation request to be granted, it had to be in writing because the official schedule stated otherwise. Viewing the evidence in the light most favorable to defendants, the non-moving parties, a reasonable

jury could have determined that defendants participated in the interactive process and made a good faith effort to provide her with an accommodation. Therefore, based upon the record, denying Richter's cross-motion for summary judgment was proper.

D.

Given that the motion judge's decision to dismiss her bodily injury claim under the LAD also included dismissal of her punitive damages claim, Richter contends that the later claim should be presented to the jury. To the extent that we have reinstated Richter's LAD claim, the statute permits punitive damages. N.J.S.A. 10:5-3 provides:

> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress . . . and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.
>
> [(Emphasis added).]

Thus, the jury must decide whether Richter proved: (1) the harm she suffered was the result of the defendant's acts or omissions, and (2) such acts or

23

omissions were actuated by "actual malice" or accompanied by a "wanton and willful disregard" of persons who foreseeably might be harmed by those acts or omissions. N.J.S.A. 2A:15-5.12(a).

III

Because we have determined that Richter's LAD claim shall proceed to trial, we now address the Board's cross-appeal contending that Richter's bodily injury claim due to the Board's failure to accommodate her disability should be barred by the exclusive remedy provision of the Compensation Act. If the bodily injury claim is not dismissed, the Board contends that Richter should not be allowed to introduce medical bills and lost wages at trial, and if she is, then it should receive 100% credit for the worker's compensation payments it made to any jury award in her favor.

A.

There is no dispute that Richter's bodily injury claim arose while she was acting within the scope of her employment. As previously noted, her workers' compensation claim paid her $18,940.94 for medical bills, $9,792.40 for temporary disability benefits and $77,200 for the permanent injuries. The Board argues that because she elected to pursue her remedies under the Compensation Act, the exclusive remedy provision of the Compensation Act bars her from receiving any additional compensation, or double recovery,

through her LAD action. <u>Estate of Kotsovska, ex. rel. Kotsovska v. Liebman</u>, 221 N.J. 568, 585 (2015), <u>Van Dunk v. Reckson Associates Realty Corp.</u>, 210 N.J. 449, 459 (2012). We disagree.

By pursuing remedies under the Compensation Act, an employee gives up the right to pursue common law claims for work-related injuries. <u>Laidlow</u>, 170 N.J. at 602. However, the Compensation Act carves out an intentional wrong exception to the exclusivity of relief provided by a workers' compensation claim where it provides:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.
>
> [N.J.S.A. 34:15-8.]

This exception was first construed by our Supreme Court in <u>Millison v. E.I. Du Pont de Nemours & Co.</u>, 101 N.J. 161 (1985). The Court held the plaintiffs' claims that the employer had fraudulently concealed that they were suffering from asbestos-related diseases, thereby delaying treatment and aggravating their existing illness, constituted an intentional wrong that was an exception to the workers' compensation bar. <u>Id.</u> at 181-82; <u>see also</u> <u>Kristiansen v. Morgan</u>, 153 N.J. 298, 312 (1998).

"An injured worker need not establish that the employer 'subjectively desired to harm him [or her]' in order to satisfy the intentional-wrong exception. Laidlow, []170 N.J. at 613." Kibler v. Roxbury Bd. of Educ., 392 N.J. Super. 45, 53 (App. Div. 2007). To recover tort damages, an employee must satisfy a two-prong test:

> [I]n order for an employer's act to lose the cloak of immunity of N.J.S.A. 34:15-8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the [Compensation] Act to immunize.
>
> [Laidlow, 170 N.J. at 617.]

Referred to as the conduct prong, the first prong may present factual issues for a jury if the evidence, "when viewed in a light most favorable to the employee, . . . could lead a jury to conclude that the employer acted with knowledge that it was substantially certain that a worker would suffer injury." Id. at 623. If so, the trial judge then moves to the second prong, referred to as the context prong, which is a question of law, to "determine whether, if the employee's allegations are proved, they constitute a simple fact of industrial life or are outside the purview of the conditions the Legislature could have intended to immunize under the Workers' Compensation bar." Ibid. When

26

determining if the two-prongs of the <u>Laidlow</u> test are met, the court must utilize a totality of the circumstances approach. <u>Van Dunk</u>, 210 N.J. at 470; <u>Laidlow</u>, 170 N.J. at 614, 622.

Applying the <u>Laidlow</u> test to Richter's LAD bodily injury claim leads us to reason that her claim is not barred by the Compensation Act's exclusive remedy provision. Considering Richter's allegations in the light most favorable to her as the non-moving party, Desiderio intentionally refused her accommodation request, and it was substantially certain that she could suffer a hypoglycemic event that could cause bodily injuries. This is not the "simple fact of industrial life" envisioned by the Compensation Act.

Our conclusion is supported by our decision over twenty years ago in <u>Schmidt v. Smith</u>, 294 N.J. Super 569, 585 (1996), where we recognized "there is no language in the LAD that mandates that claims made by employees against employers under it may only be brought under the" Compensation Act. Given the LAD is remedial social legislation, it should be liberally construed "in combination with other protection available under the laws of this state." <u>Id.</u> at 586 (citing N.J.S.A. 10:5-3); <u>see also</u> <u>Royster</u>, 227 N.J. at 500-01. Accordingly, Richter can present her bodily injury claims directly arising from her LAD claim to the jury.

Should we allow Richter to present her bodily injury claim and the jury award her damages, the Board contends that Millison and Calalpa v. Dae Ryung Co., Inc., 357 N.J. Super. 220, 229 (App. Div. 2003), dictate that as her employer and a defendant in her civil suit, it is entitled to a 100% credit of the workers' compensation award it paid her. Richter asserts that she is not looking for double recovery, but posits that under section 40, the Board or its workers' compensation carrier is entitled to a credit of two-thirds of the workers' compensation award with her counsel allowed the one-third balance for counsel fees plus costs up to $750. Based upon our interpretation of Millison, Calalpa and section 40, we favor Richter's argument.

In Millison, in addition to adopting the substantial certainty two-prong test to determine if an employee can hurdle the exclusive remedy of filing a worker's compensation claim, the Court also addressed the offsets for workers' compensation benefits an employer was entitled to receive when it was held liable in a civil action. 101 N.J. at 178, 187. The Court reasoned:

> If . . . a plaintiff should prevail in his suit based on intentional wrong, he would not be entitled to keep the entire amount of his compensation award as well as his civil suit remedy. That double recovery is to be avoided is evident from so much of the Compensation Act as demands that compensation claimants who have recovered from third parties be required to reimburse their employer or its insurance carrier for

28

compensation payments already made. N.J.S.A. 34:15-40. Thus if the trier-of-fact determines that du Pont and/or its doctors have been guilty of an intentional wrong as a result of their alleged fraudulent concealment of existing occupational diseases, du Pont or its insurance carrier will be able to offset compensation benefits previously paid to the extent that the civil damage award would serve as a double recovery.

[101 N.J. at 187 (emphasis added).]

The impact of Millison was clarified in Calalpa for situations, such as here, where the potential

tortfeasor is the employer, [thus] the employer is not "neutral" and, if entitled to a lien, would not in the tort litigation "pay[] exactly the damages he or she ordinarily pay . . . ," or "come out even." This is so because, facially, the employer has paid damages from its tort pocket, but took some of that payment back from its workers' compensation pocket.

[357 N.J. Super 227-28.]

The workers' compensation carrier was entitled to a 100% credit, meaning "a dollar for dollar lien" under section 40 for two reasons. Id. at 228, 231.

First, "the 'double recovery' referred to by the Millison Court within the context of an injured employee's receipt of both workers' compensation benefits and civil damages for the same injuries focuses upon the notion that

29

an employee cannot have both." Id. at 228. In 1913, section 40[5] was enacted to prevent an employee's double recovery. Under equitable considerations, an employee cannot "retain all or a part of both his or her compensation benefits and tort proceeds. . . ." Id. at 228-29. Thus, "the 'to the extent' language in Millison probably reflects the Court's recognition that employer intentional wrong is difficult to prove and a plaintiff, therefore, may well not obtain any monies at all in the tort litigation." Id. at 229.

Second, "the 'third person' concept in [section 40] has been broadly applied to both true third person tortfeasors and tortfeasors who are the 'functional equivalent.'" Id. at 229 (citing Frazier v. New Jersey Mfrs. Ins., 142 N.J. 590, 598 (statutory lien applied to attorney malpractice damages); Midland Ins. Co. v. Colatrella, 102 N.J. 612, 618 (1986) (statutory lien applied to uninsured motorist insurance recovery)). "Where an employee has pierced the threshold of the compensation bar, he or she has established that the employer's conduct is beyond the 'natural risk[s] of' employment and does not 'arise[] out of' the employment relationship." Calalpa, 357 N.J. Super. at 229

---

[5] Providing, in pertinent part, that an employee will be "guaranteed recovery for his common-law damages against contributing third-party tortfeasors or for his [workers'] compensation award, whichever is greater, but he may not duplicate these recoveries."

(citing <u>Laidlow</u>, 170 N.J. at 606.)  Thus, the employer is no longer an employer under the Compensation Act but "an actionable tortfeasor."  <u>Id.</u>

Consequently, should the Board be found liable for Richter's bodily injury claim under the LAD for failure to accommodate Richter as a "third-party" tortfeasor, its lien on the jury award is pursuant to section 40.  In this statutory scheme, the Board's or its insurance carrier reimbursement is as follows:

> If the sum recovered by the employee or his dependents from the third person or his insurance carrier is equivalent to or greater than the liability of the employer or his insurance carrier under this statute, the employer or his insurance carrier shall be released from such liability and shall be entitled to be reimbursed, as hereinafter provided, for the medical expenses incurred and compensation payments theretofore paid to the injured employee or his dependents less employee's expenses of suit and attorney's fee as hereinafter defined.
>
> [N.J.S.A. 34:15-40 (b).]

Therefore, if the award recovered by Richter is "equivalent to or greater than the liability of the employer from an award," in this case, $28,733.84 for medical bills and temporary disability benefits, the Board is allowed to keep two-thirds with Richter's counsel being entitled to the remaining one-third for counsel fees and costs not to exceed $750.  N.J.S.A. 34:15-40 (b) and (e).

A-0102-17T2

Finally, we reject the Board's contention that Richter should not be able to present her medical and lost wages as evidence. Without allowing the jury to consider these damages, the trial court cannot determine whether the Board is entitled to a section 40 lien.

Affirmed in part, reversed in part and remanded for trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0102-17T2